UNITED STATES of America,
Plaintiff-Appellee,

v.

Errol B. RESNICK et al., Defendants-
Appellants.

No. 29706.

United States Court of Appeals,
Fifth Circuit.

Feb. 3, 1972.

Rehearing and Rehearing En Banc
Denied June 2, 1972.

John L. Briggs, U. S. Atty., Kendell W. Wherry, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before GODBOLD, SIMPSON and CLARK, Circuit Judges.

GODBOLD, Circuit Judge:

Appellants were charged with melting silver currency of the United States in violation of 18 U.S.C. § 2, 31 U.S.C. § 395, 31 C.F.R. § 82, and 18 U.S.C. § 371, and conspiracy to commit that substantive offense. On January 31, 1970, Resnick was found guilty of both charges, Carlton of only the conspiracy charge, and Davis and Simpson of only the melting charge. All appeal.

The major questions before us concern searches and seizures near Orlando, Florida, at Teterboro, New Jersey airport, and at Kennedy Airport in New York City. Pretrial motions to suppress were denied, and fruits of the searches and seizures were used at trial. The convictions of Resnick, Davis and Simpson must be reversed because of invalidity of searches and seizures occurring in Florida.

## I. The Florida Searches and Seizures

We set out the facts as revealed by the hearing on motions to suppress. In late February 1969, after learning that an unusually large number of coins were being air-shipped to Orlando, federal officers began an investigation, with Secret Service Agent William Williamson in charge. At the Orlando airport they examined airbills and learned that Resnick was the consignee on numerous large incoming shipments of coins from all over the United States. They commenced surveillance over such incoming shipments. They observed a pickup truck and an ambulance picking up various coin shipments at the airport, and at times they followed those vehicles to Resnick's home in Orlando.

On March 11, 1969, about two weeks after the investigation commenced, agents saw the truck pick up a shipment of coins at the airport and proceed, heavily loaded,

James M. Russ, Michael F. Cycmanick, Orlando, Fla., Law Offices of James M. Russ, for Errol B. Resnick & Robert Jay Carlton, court-appointed for John Thomas Simpson.

Robert W. Duckworth, Orlando, Fla., for John Phillip Davis, court-appointed.

to Resnick's home, and from there to a fenced tract of densely wooded land, located on a public road 10 to 12 miles from Orlando. The tract was approximately 1,000 yards from the Orlando Sports Stadium and in a sparsely populated area where there were only scattered houses and some citrus groves and farms. This was the first time the location had come to the attention of the agents. They could see that along the road and the two sides running back from the road the tract was fenced with a six-foot chain link fence surmounted by barbed wire one foot high and extending outward from the fence. They observed locked gates in the fence and saw the pickup enter through these gates, after which the gates were relocked. The truck disappeared from view in the dense woods. No structure was visible from outside the fence.

On the same day Agent Williamson arranged to view the area from a Florida Highway Patrol airplane. He observed that the tract was rectangular in shape, approximately 20 acres, all densely wooded, and fenced on all sides with what appeared to be a solid fence, except that at one corner a lake cut into two sides of the property in an arc 300 to 400 yards long, which was unfenced. Near the center of the tract he could see the roof of a building similar to a two-car garage, and the pickup parked next to this structure.

The next day, March 12, there began a series of searches of the fenced tract, terminating in the arrest of two men in the building and a massive seizure, all without warrants. The first entry occurred the afternoon of March 12. Williamson and two other agents entered the fenced tract at a point where the fence joined the lake, by separating and crawling through barbed wire strands that extended from the termination of the fence toward or into the water's edge, and then wading through marshy area. They positioned themselves in the woods about 75 to 100 feet from the building. They observed that along most of one side there was a garage-type overhead door, and in the rear one normal door, and that the building was windowless. The large door was open, and they were able to see inside the building. They saw what appeared to be a reflection of fire on the inside walls of the building and were able to hear voices, loud banging, and a roar which they identified as that of a blast furnace. They were unable to see anyone or distinguish any conversation. After maintaining surveillance for 45 minutes to an hour, the agents departed the same way they had entered.

On that afternoon, March 12, Williamson considered staging a "raid" on the site, and arranged for the assistance of local law enforcement agencies for that purpose. However, as the person in charge, he decided not to conduct the raid that day.

Entry number two occurred later on March 12, around 7:00 p. m., when it was almost dark. Williamson and one or more others returned by entering through the same place where the fence joined the lake. After they reached the building they were joined by one or two more agents, whose mode of entry is unrevealed. The building was closed and unoccupied and the vehicles were gone. There was an opening in the floor of an overhanging eave, caused by a piece of the plywood floor of the eave being missing. Williamson climbed a stepladder that was standing against a wall of the building and stuck his head into the opening. With the aid of a flashlight he observed an overhead crane and the frame supporting it, a workbench, a fan, and what appeared to be the rim of a blast furnace or melting pot at the edge of a pit in the floor. Another agent climbed the ladder and made a similar visual examination of the interior of the building. This search required about an hour and a quarter. While it was going on an unidentified vehicle came, and the agents took cover in the woods until it departed.

During the day of March 12, but at a time not stated, some of the federal agents saw the ambulance leave the fenced tract, heavily loaded, and go directly to Resnick's residence.

Early in the morning of March 13, Williamson observed Resnick's DC–3 airplane depart the Orlando airport. He did not know but suspected that it was carrying silver bars. He obtained its flight plan and its destination was determined to be Teterboro Airport, New Jersey, and arrangements were made with federal officers in that area to meet the plane and determine its cargo if possible.[1]

At midmorning of March 13 the third warrantless search began. Williamson and two other agents entered again where the fence joined the lake and took up their positions about 75 feet from the building, which they judged to be approximately 500 yards from the lake. They observed the pickup parked in front of the building and three men working in and about the vicinity of the building. They could see approximately three quarters of the way into the garage and observe activities carried on there. One of the men under observation, later identified as Babcock, departed, returned, and departed again.[1A] Sounds of motors running were heard as well as what the agents thought to be the sound of a blast furnace. They saw eight to ten canvas coin bags lying on the apron of the building. The remaining two men, Davis and Simpson, were observed to cut pieces of copper, take the material to scales inside the building, and then to the rear of the building. Later, just inside the door of the building, they dumped coins out of bags. One of them picked up coins in a scoop and took them to the rear of the building. Davis took empty coin bags to a pit a short distance from the building. Agent Williamson then concluded that they were "in position to raid the site." They directed other law enforcement personnel that were "in position" and with whom they were in radio communication to come to the area of the building. Whether these other officers—federal and local—were positioned within the tract or outside is not shown by the testimony, and, regardless of when they

entered the record is silent on how they did so. After calling these other officers to the scene, the agents at the building site came out of the bushes, entered the open door and arrested Davis and Simpson.

Davis and Simpson were taken outside the building and held in custody for approximately an hour until Babcock returned, when he too was arrested. All three were then taken by agents to Orlando and presented before a United States Commissioner. Meanwhile, commencing with the arrest of Davis and Simpson, agents entered the building, searched it, and took numerous photographs. They found three small furnaces in a pit in the floor, in operation, and coins both sacked and piled on the floor. They seized almost everything in the building, including bags of United States coins, crucibles containing metal thought to have previously been United States coins, molds, a crane, scales, and a generator. They seized various other items outside the building.

Agents found the ambulance parked nearby in the trees, and, after opening the rear door, found a number of rolls of coins in an interior compartment. After Babcock returned in the pickup it too was searched.

While the three suspects in custody were being taken to the United States Commissioner, some of the officers remained at the site, making an inventory, waiting for the hot furnaces to cool, and waiting for transportation for the fruits. The items seized were so numerous, and some of them so large, that Williamson, who accompanied the suspects to Orlando, arranged for a moving van and a three-man crew to go to the scene. When the van arrived, loading the seized items took approximately an hour and a half, and removal was completed around 8:00 p. m.

In making their entries and surveilling the tract the agents found that from no point on the ground outside the fence could they observe the building. And

---

1. The resulting search of the plane is discussed, *infra.*

1A. Babcock was acquitted on both substantive and conspiracy charges.

they observed that the entry gates remained locked except when vehicles were entering and departing.

From the commencement of the investigation and through the arrests and seizure in and around the building on March 13, no application was made to a magistrate or judicial officer for either an arrest warrant for persons thought to be on the premises or for a search warrant for the premises.

Motions to suppress were filed by Resnick, Carlton, Simpson and Davis. The trial judge heard extensive testimony on August 14 and 15, 1969, and on September 9 denied the motion. Subsequently he filed a detailed and careful opinion basing his denial on these grounds: (a) the "open field" doctrine [2] governed the observations made by the agents prior to arrest of Davis and Simpson; (b) after seeing bags of coins emptied, the agents had probable cause to arrest Davis and Simpson; (c) the search from that time on, and the seizures, were incident to the valid arrests.

The trial judge concluded that since Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), there has been serious question of continued vitality of the open field doctrine, but he elected to follow the post-*Katz* cases of Fullbright v. United States, 392 F.2d 432 (10th Cir.), cert. denied, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968), and United States v. Campbell, 395 F.2d 848 (4th Cir.), cert. denied, 393 U.S. 834, 89 S.Ct. 106, 21 L.Ed.2d 105 (1968), which continued to apply the doctrine.[3]

 We conclude that the second and third searches, and the seizures, cannot be sustained. This requires reversal as to all defendants except Carlton. We pretermit decision at this time of the validity of the first search.

In United States v. Pearson, 448 F.2d 1207 (5th Cir. 1971), this Circuit noted the Supreme Court's emphasis upon the disfavor attached to warrantless searches expressed in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), quoting from that case the following:

> "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption * * * that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.'" (Footnotes omitted.)

448 F.2d at 1211 *quoting* 403 U.S. at 454, 91 S.Ct. 2022, 29 L.Ed.2d at 576. In United States v. Sokolow, 450 F.2d 324 (5th Cir. 1971) and United States v. Drew, 451 F.2d 230 (5 Cir. 1971), we have again recognized the stringent burden upon the government of bringing itself within one of the narrowly drawn exceptions and of showing that the exigencies of the situation made it imperative to proceed "outside the judicial process, without prior approval by judge or magistrate." As to the second and third searches that burden has not been met.

Pretermitting whether there were sufficiently exigent circumstances to justify the first warrantless entry, there were no exigent circumstances after that initial incursion. The government then had more than adequate probable cause

2. *E. g.*, Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); United States v. Hollon, 420 F.2d 302 (5th Cir. 1969); Atwell v. United States, 414 F.2d 136 (5th Cir. 1969); Hodges v. United States, 243 F.2d 281 (5th Cir. 1957).

3. On July 10, 1969, this Circuit decided Atwell v. United States, 414 F.2d 136 (5th Cir. 1969), and on Dec. 18, 1969, United States v. Hollon, 420 F.2d 302 (5th Cir. 1969), in both cases applying the open field doctrine without mention of *Katz*.

on the basis of which it could obtain a search warrant, available from the United States District Court in Orlando, 10 miles away. It knew that Resnick had been receiving large and numerous shipments of coins. Government agents knew the pickup truck and the ambulance that were picking up coin shipments and observed them going from the airport to Resnick's home. On March 11 agents had observed the truck pick up a shipment of coins and, heavily loaded, go to Resnick's home and then on to the fenced tract. At the first entry on March 12 the agents had seen a reflection of fire, had identified a roaring sound as the noise of a blast furnace, and had heard the loud banging of metal striking against metal. During the day on March 12 the ambulance had been seen leaving the site, heavily loaded, and going to Resnick's home. The unusual security precautions concerning the site were known. We note also Williamson's suspicion when Resnick's plane departed early on the morning of March 13, that it was carrying silver bullion. The suspicion was sufficiently strong that federal officers in the New York-New Jersey area were alerted to meet the plane and attempt to ascertain its cargo, which they did.

■ In explanation, at the hearing on motions to suppress, Williamson testified that he considered he had no probable cause for either an arrest or search warrant until agents actually observed coins at the site. This is not tenable. Certainty that a crime was being committed at the site was not required, only reasonable cause to believe that it was. And, in any event, the scope of the Fourth Amendment is not determined by the subjective conclusion of the law enforcement officer. The interposition of magistrate between officer and citizen to see if there really was probable cause was readily available, and no emergency prevented resorting to him for normal judicial process. It is evident from the testimony at the motion hearing that what the agents were seeking was to find persons at the site engaged in melting coins and to arrest them in the act, and they continued to enter and to search until they found such a state of affairs. This pursuit of an airtight case may have been commendable police work, in the investigatory sense, but it was not an exigent circumstance that would support continued warrantless searches. There is no evidence that equipment would be destroyed or removed, that participants would flee, or even that use of the premises for smelting would cease. On March 13 the agents, at the scene and warrantless, were, insofar as effective police work was concerned, in the same place and circumstances they would have been had they secured warrants.

The policy of the exclusionary rule which forbids the use at trial of evidence obtained in violation of the Fourth Amendment is not to exclude unreliable evidence or to chastise law enforcement officers or to assist the criminal accused. "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way —by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669, 1677 (1960).

■ A second reason for our conclusion is that the only justification which the government presents for the second entry is the open field rule, and no application of that doctrine sustains the search of the interior of a locked, windowless building, in the nighttime, by agents climbing a ladder, thrusting their heads into a hole in the eaves, and scrutinizing the interior with the aid of a flashlight.

The third search cannot be sustained, for reasons already stated, plus the fact that it was at least in part the fruit of the second search. All items seized at the site when it was raided should have been suppressed.

If the government seeks a retrial, the validity of the initial search should be reconsidered by the District Court in the light of *Coolidge.* Some of the limita-

tions on the plain view exception which that decision describes already have been followed in this circuit in *Sokolow* and *Drew.* The underlying rationales of the plain view rule and the open field doctrine are little, if any, different. As the District Court noted, there is some doubt of the viability of the open field doctrine since *Katz.* Whether it has survived *Coolidge,* and if so in what form, are questions of far-reaching importance to law enforcement. They are not adequately presented to us for decision on this appeal.

■ The motion of appellant Carlton to suppress the fruits of the searches and the seizures at the fenced site was properly denied. He was not present at the site and claimed no interest in the site or in the property subjected to either searches or to seizures and, therefore, lacked standing to object. United States v. James, 432 F.2d 303 (5th Cir. 1970), cert. denied, 403 U.S. 906, 91 S.Ct. 2214, 29 L.Ed.2d 682 (1971); Stassi v. United States, 410 F.2d 946 (5th Cir. 1969). The fact that he was a codefendant and an alleged coconspirator and that introduction of fruits of the illegal searches and seizure was damaging to him did not give him standing to object.[4] Alderman v. United States, 394 U.S. 165, 171–172, 89 S.Ct. 961, 22 L.Ed. 176, 185–186 (1969); Stassi v. United States, *supra.*

## II. The Search at Teterboro Airport

■■ The validity of this warrantless search of Resnick's airplane turns on whether consent was given by Carlton, a person responsible for the plane. The District Judge found, on conflicting testimony, that Carlton did consent. We cannot say that this was plainly erroneous, which is our scope of review of facts found at a motion to suppress hearing. See United States v. Gunn, 428 F.2d 1057 (5th Cir. 1970); United States v. Montos, 421 F.2d 215 (5th Cir.) cert. denied, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). We do not read Perkins v. Henderson, 418 F.2d 441

(5th Cir. 1969), to require that an officer state affirmatively that he will not search if permission is refused, or that he cannot and will not search without consent.

## III. The Search at Kennedy Airport

■■ Information regarding a suspected shipment of 37 cartons of silver bullion being transported via Eastern Airlines to New York Kennedy Airport was relayed to federal agents in New York from officials in Orlando. Agents arrived at the Eastern Airlines cargo complex on the afternoon of March 13, not having obtained a search warrant. They identified their authority to the Eastern cargo security manager, who took them to the cargo area and to the vicinity of the cartons in question. The agents were not trespassers. Entry into the cargo area, though not open to the public, could be granted by the security manager, the person in charge of the premises. Corngold v. United States, 367 F.2d 1, 7 (9th Cir. 1966). The District Court held—and we do not find it clearly erroneous—that once inside the cargo terminal the agents saw the Resnick freight stacked on a cargo pallet, that some of the packages were torn, and that in one they could see a bar of metal which resembled silver. The District Court found, and we accept, that the agents did not tamper with or open any of the cartons. Based on the probable cause of what they had seen, the officers secured a search warrant and seized the silver. The inadvertence requirement of *Coolidge,* would not require suppression. There was no warrantless seizure, only an observation of the freight without intrusion into any protected interest of any defendant, making possible a plain view of contents, followed by issuance of a warrant. The motion to suppress was properly denied as to this seizure.

## IV. Revocation of the Treasury Regulation

Approximately two months after the indictments were returned in this case,

---

4. This is as true of the first entry as of the second and third, so the fact that we

leave open the validity of the first does not affect Carlton.

the regulation issued pursuant to the authority granted in 31 U.S.C. § 395 was revoked. Section 395 provides:

(a) Whenever in the judgment of the Secretary such action is necessary to protect the coinage of the United States, he is authorized under such rules and regulations as he may prescribe to prohibit, curtail, or regulate the exportation, melting, or treating of any coin of the United States.

(b) Whoever knowingly violates any order, rule, regulation, or license issued pursuant to subsection (a) of this section shall be fined not more than $10,000, or imprisoned not more than five years, or both.

The regulation issued thereunder stated:

Except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) or as provided in this part, no silver coin of the United States may be melted, treated, or exported from the United States or any place subject to the jurisdiction thereof. This prohibition shall not apply to any Department or agency of the United States.

31 C.F.R. § 82.1 (1967). The Secretary of the Treasury attempted to qualify his revocation of this regulation by a saving clause which would allow the continuation of all prosecutions pending under the discontinued regulation and the bringing of new prosecutions for violations occurring before the revocation date. 34 Fed.Reg. 7704 (1969).

■ By motions to dismiss the indictments, the defendants contended that a pending criminal prosecution based on a revoked regulation must be dismissed, and, alternatively, that the Secretary lacked authority to enact a saving clause to a revoked regulation. Disagreeing, the District Court reached only the first contention and held that a pending criminal prosecution based on a regulation revoked after the indictment has been issued need not be dismissed. We agree with the District Court, and, like it, do not reach the saving clause issue.

Appellants cite cases as recent as Bell v. Maryland, 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964), and as ancient as United States v. Schooner Peggy, 1 Cranch 103, 2 L.Ed. 49 (1801), for the proposition that a prosecution cannot be maintained or continued after the authorizing legislation has been repealed or has expired. But here the authorizing legislation has not been repealed nor has it expired. It is the Act and not the regulation which establishes the crime and fixes the penalty. Only the administrative rule was revoked, a power lawfully delegated to the executive "to fill up the details." United States v. Grimaud, 220 U.S. 506, 517, 31 S.Ct. 480, 55 L.Ed. 563, 568 (1911). See also United States v. Hark, 320 U.S. 531, 64 S.Ct. 359, 88 L.Ed. 290 (1944) (indictment for violation of a regulation issued pursuant to an enabling statute and revoked prior to the indictment) and United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). The revocation of the regulation does not bar the prosecution of the defendants in this case.

Reversed as to appellants Resnick, Davis and Simpson.

Affirmed as to appellant Carlton.