**UNITED STATES of America, Plaintiff-Appellant,**

v.

**UNI OIL, INC., Defendant,**

**Thomas M. "Mick" Hajecate, et al., Defendants-Appellees.**

No. 82–2295.

United States Court of Appeals, Fifth Circuit.

Aug. 1, 1983.

James R. Gough, Asst. U.S. Atty., Houston, Tex., Jerome Wiener, U.S. Dept. of Energy, Washington, D.C., for plaintiff-appellant.

Michael E. Tigar, Washington, D.C., for Thomas M. Hajecate and Charles R. Akin.

Dan Ryan, John C. Marshall, III, Houston, Tex., Charles Brandt, Lafayette, La., for James E. Fisher.

Before GARZA, RANDALL and GARWOOD, Circuit Judges.

RANDALL, Circuit Judge:

This appeal comes to us under 18 U.S.C. § 3731 upon an order of the district court dismissing an eighty-four count fraud indictment against two oil companies and five individual defendants. "The gravamen of the ... charge," as we observed when these proceedings were last before us, "is that [the defendants] purchased 'old' oil and resold it as 'new,' willfully using fraudulent means to miscertify it, in the process." *United States v. Uni Oil, Inc. (Uni I),* 646 F.2d 946, 948 n. 2 (5th Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1254, 71 L.Ed.2d 446 (1982). The district court dismissed the indictment on the ground that President Reagan's Executive Order No. 12,287, 3 C.F.R. 124 (1982), *reprinted in* 15 U.S.C. § 757 note (Supp.V 1981), abolished the distinction between "old" and "new" oil, and therefore abated the prosecution. Because we find that the doctrine of abatement does not apply, we vacate the decision of the district court and order that the indictment be reinstated.

I

We have already recounted the facts of this case in *Uni I.* Briefly, on March 7, 1979, a federal grand jury in Houston returned an eighty-four count indictment against Uni Oil, Ball Marketing Enterprise, Thomas "Mick" Hajecate, Thomas "Tom" Hajecate, James Fisher, Charles Akin, and Charlie Goss. The eighty-four counts variously alleged that the defendants had violated the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1962 (1976), the mail fraud statute, 18 U.S.C. § 1341 (1976), the wire fraud statute, 18 U.S.C. § 1343 (1976), and the statute prohibiting the willful making of false or fraudulent statements to a government agency, 18 U.S.C. § 1001 (1976). The government has charged, in essence, that the defendants have engaged in the business of counterfeiting documentation required by the Emergency Petroleum Allocation Act, 15 U.S.C. §§ 751–760h (1976) (partially superseded): the defendants allegedly acquired lower-tier or "old" oil (which was worth about $5 per barrel) for the purpose of falsifying its documentation and reselling it as upper-tier or "new" oil (which was worth about $13 per barrel). *See* 10 C.F.R. § 212.131 (1979) (superseded).

The defendants objected to the indictment on almost every conceivable ground. Apparently because it found some of the objections persuasive, the district court dismissed the entire indictment on June 5, 1979, without opinion. The government appealed from the dismissal. On that first appeal we found merit in none of the objections, vacated the district court's order, and

remanded the case for "proceedings consistent with [our] opinion." *Uni I,* 646 F.2d at 955.

After receiving the case upon remand, the district court again dismissed the indictment, this time because it thought that the ending of oil price controls constituted a common law abatement. The chronology of this case now becomes important. The indictment was returned in 1979. Under the regulatory scheme then in effect—and with certain exceptions not material here—all domestic crude oil had to be certified as either "old" or "new" before it could be sold. *See* 10 C.F.R. § 212.131 (1979). The regulations required the industry to maintain accurate records of such sales, and provided that those records were subject to inspection "at any time upon the request" of the Department of Energy. 10 C.F.R. § 210.92 (1979). After an initial period when price controls were mandatory, however, the EPAA provided for a transition period during which the President, by executive order, could end controls. In any event, all controls were to expire automatically on September 30, 1981. *See* EPAA § 18, 15 U.S.C. § 760g (1976) (added by the Energy Policy and Conservation Act in 1975).

Almost immediately after taking office at the beginning of 1981, President Reagan elected to exercise his discretionary authority to end controls early. On January 28, he promulgated Executive Order 12,287, *supra,* which declared that "[a]ll crude oil and refined petroleum products are exempted from ... price and allocation controls." The Department of Energy duly issued implementing regulations on March 30 and July 9. *See Price and Allocation Regulation Revocation,* 46 Fed.Reg. 20,508 (1981); *Establishment of a Mechanism for Entitle-*

*ments Adjustments for Periods Prior to Decontrol of Crude Oil,* 46 Fed.Reg. 36,092 (1981). Relying on the new regulations, the defendants moved for a dismissal of the indictment on the ground of abatement. What they had allegedly done, they argued, could no longer be considered a crime.

The district court's opinion dismissing this indictment for the second time rested upon two bases. First, the court concluded that Executive Order 12,287 had substituted the right to sell oil in a free market for the crime of selling in a controlled market with falsified certificates, just as Title II of the Civil Rights Act of 1964, as construed in *Hamm v. City of Rock Hill,* 379 U.S. 306, 314, 85 S.Ct. 384, 390, 13 L.Ed.2d 300 (1964), had substituted the federal right to be served at a public lunch counter for the state-law crime of trespass. The application of abatement in this case, according to the district court, rested not upon some notion of "technical abatement," but rather upon the President's basic decision to substitute a right for a crime. Second, the court concluded that the application of abatement here was especially appropriate in that it would further the salutary goal of "avoiding the infliction of punishment when to punish would no longer serve any purpose and 'would be unnecessarily vindictive'" (quoting *Hamm, supra,* 379 U.S. at 313, 85 S.Ct. at 390).

The government has again appealed. It argues, first, that this is a Title 18 fraud, not an abatement case; second, that even if this is an abatement case, only congressional intent matters and Congress does not intend for any prosecutions to abate; and third, that even if executive intent does matter, the Executive also does not and has never intended that this prosecution abate. We address each argument in turn.[1]

---

1. Certain of the defendants have raised three additional issues on this appeal. We find these points to be without merit.

First, Charles Goss and Ball Marketing Enterprise argue that we are without jurisdiction in this case because the issues here fall within the exclusive jurisdiction of the Temporary Emergency Court of Appeals. We reject this argument for the reasons given in *Uni I, supra,* 646 F.2d at 949–53.

Second, Charles Goss and Ball Marketing Enterprise argue that the government's notice of appeal is fatally defective with respect to them because their names were inadvertently omitted from the case caption on the notice. This argument is frivolous. Federal Rule of Appellate Procedure 3(c), as amended in 1979, codifies the prior practice in this circuit and provides that "[a]n appeal shall not be dismissed for informality of form *or title* of the notice of appeal" (emphasis added). Rule 3(a) further

## II

The government first argues that an abatement analysis is out of place in this case because the RICO, mail fraud, wire fraud, and false statement statutes that form the basis of the indictment have been neither repealed nor amended. We disagree.

As the government accurately points out, we have already emphasized that this is a fraud, not a regulatory case:

[Even] [i]n the absence of the existence of the [Emergency Petroleum Allocation Act] or of any [oil price control] regulations, it would presumably be a criminal act to use the mails as part of a scheme to defraud by falsely certifying facts relating to the provenance of oil knowingly and with intent to defraud. What makes the act criminal is not the regulation, but the use of the mails to carry an untrue document fabricated with fraudulent purpose.

. . . .

[The] defendants are charged with Title 18 offenses, not [with] violations of the EPAA.

*Uni I,* 646 F.2d at 949, 952 n. 4. But this language, as the district court has already observed in reply, only addressed the question whether the case was one "arising under" the EPAA, and therefore within the exclusive jurisdiction of the Temporary Emergency Court of Appeals. *See Uni I,* 646 F.2d at 949–53. The allegedly fraudulent utterance of the certificates required by 10 C.F.R. § 212.131 (1979) nevertheless remains an important part of the transactions forming the basis of the charges under the Criminal Code. Indeed, we have no doubt that even if Congress or the Executive had intended to abate all prosecutions for acts committed under the *ancien régime,* they would not have manifested that intent by amending (or recommending the amendment of) any provision of the Criminal Code; rather, that intent would surely

provides that the "[f]ailure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal." *Accord, Scherer v. Kelley,* 584 F.2d 170, 174–75 (7th Cir.1978) (caption on notice of appeal only included one agency name and case number that referred only to that agency; notice held sufficient with respect to three other agencies as well), *cert. denied,* 440 U.S. 964, 99 S.Ct. 1511, 59 L.Ed.2d 778 (1979); *cf. McKnight v. Blanchard,* 667 F.2d 477, 482 (5th Cir.1982) ("The administrative captioning of the suit obviously has no effect on what cause of action and what parties are (or are not) joined in the substantive allegations of the pleadings."). To the limited extent that it was not modified on rehearing, the one case that the defendants cite in support of a contrary result is distinguishable. *See United States v. Santia-Manriquez,* 603 F.2d 575, 577 (1979) (notice of appeal whose body plainly referred to only one "defendant" in the singular did not include codefendant, and out-of-time notice filed with respect to that codefendant did not cure the defect since it was filed after the jurisdictional time limitation had expired), *materially modified,* 609 F.2d 1162 (5th Cir. 1980) (both appeals held timely). In the absence of substantial prejudice to a party, it is too late in the day to revive the kind of hypertechnical reading of legal papers that might have prevailed under a nineteenth-century code pleading system. *See generally* 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* § 3949 (1977 & Supp. 1983). The government's notice of appeal was

served on counsel for Ball and Enterprise Marketing and plainly demonstrated an intention to appeal from the entire order of April 21, 1982. That is enough.

Third, defendant Thomas "Tom" Hajecate claims that he was not properly served with the notice of appeal and that the appeal with respect to him must therefore be dismissed. This claim, too, is frivolous. Federal Rule of Appellate Procedure 3(a) plainly provides that only the timely filing of the notice is a sine qua non, and rule 3(d) provides equally plainly that the responsibility for serving the notice on the parties is the clerk's, and not the appellant's. The rule further provides that "[f]ailure of the clerk to serve notice shall not affect the validity of the appeal." Here, the defendant was in no sense prejudiced by the alleged delay in his notification. He unquestionably received a preliminary (typewritten) copy of the government's brief on appeal when the other defendants received their copies. Supplemental Brief for Thomas Hajecate at 3. A delay in service is not jurisdictional; no substantial prejudice followed from the delay in this case; and we can see no reason why the appeal with respect to this defendant should be dismissed. *See Perington Wholesale, Inc. v. Burger King Corp.,* 631 F.2d 1369, 1379–80 (10th Cir.1980) (omission of defendant from caption on notice of appeal and lack of service of notice on that defendant did not require dismissal of appeal with respect to him).

have manifested itself through some modification of the EPAA or of the implementing regulations. We do not, in other words, question that this is a fraud case under the Criminal Code and that no relevant part of that Code has been subsequently amended or repealed, but these facts do nothing to help us decide whether Congress (or the Executive) intends this prosecution to proceed unabated.

The three cases that the government cites seemingly to the contrary effect are inapposite. *See Kay v. United States,* 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607 (1938); *United States v. Kapp,* 302 U.S. 214, 58 S.Ct. 182, 82 L.Ed. 205 (1937); *United States v. Meyer,* 140 F.2d 652 (2d Cir.1944); *see also United States v. Mandujano,* 425 U.S. 564, 577, 96 S.Ct. 1768, 1776, 48 L.Ed.2d 212 (1976) (plurality opinion). In *Kapp,* for instance, the Supreme Court held that a prosecution under the Criminal Code of defendants who had made false representations to secure benefits under the Agricultural Adjustment Act should proceed, even though the relevant portions of the Act had subsequently been declared unconstitutional in *United States v. Butler,* 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936). The Court commented that "[i]t might as well be said that one could embezzle moneys in the United States Treasury with impunity if it turns out that they were collected in the course of invalid transactions," and concluded that "[i]t is cheating the Government at which the [false statement] statute aims and Congress was entitled to protect the Government against those who would swindle it regardless of questions of constitutional authority as to the operations that the Government is conducting." 302 U.S. at 217–18, 58 S.Ct. at 184. *Kay* presented virtually the same issue under the Home Owners' Loan Act (which the defendants felt to be of dubious constitutionality). 303 U.S. at 6–7, 58 S.Ct. at 471. *Meyer* similar-

ly involved false statements made before a wartime Exclusion Board. None of these cases concerned the intent of Congress or the Executive to have criminal prosecutions proceed unabated in the face of subsequent changes in the relevant regulatory scheme.

We therefore turn to an examination of the doctrine of abatement and its application to congressional and executive intent.

### III

"The rule is well established," according to the Supreme Court, "that prosecutions under statutes impliedly or expressly repealed while the case is still pending on direct review must abate in the absence of a demonstration of contrary congressional intent or a general saving statute." *Pipefitters Local Union No. 562 v. United States,* 407 U.S. 385, 432, 92 S.Ct. 2247, 2272, 33 L.Ed.2d 11 (1972). Abatement has been consistently applied in the federal courts at least since the days of Chief Justice Marshall, *see United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801) (Marshall, C.J.), and has been extended to cover prosecutions under subsequently revoked or modified regulations. *See, e.g., Thorpe v. Housing Authority,* 393 U.S. 268, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969). The parties have argued extensively about whether the application of the doctrine depends exclusively upon legislative intent, or whether executive intent would also be sufficient. Because we find that, in this case, the legislative and executive branches of the government intend exactly the same thing, we need not resolve that question.[2] We turn first to legislative intent.

### A

We think it clear that Congress unquestionably intends this prosecution to proceed. The EPAA has an express savings provi-

---

2. The government accurately points out that there appear to be no reported decisions holding that prosecutions must abate because of executive, rather than legislative intent. *See* note 4, *infra* (summarizing representative cases). From this, the government concludes that the doctrine of abatement depends only on legislative intent. We think that an equally

plausible explanation of the cases is that the Executive need not rely upon elaborate theories of abatement to terminate a prosecution: it has only to order its attorneys to drop the matter. *See* Fed.R.Crim.P. 48(a); *United States v. Cowan,* 524 F.2d 504, 513 (5th Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976).

sion, which reverses the common law presumption of abatement.[3] Section 18 of the Act, added by the Energy Policy and Conservation Act in 1975, provides in pertinent part:

The authority to promulgate and amend any regulation or to issue any order under this chapter shall expire at midnight September 30, 1981, but such expiration shall not affect any action or pending proceedings, administrative, civil, or criminal, not finally determined on such date, nor any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date.

EPCA, Pub.L. No. 94–163, sec. 461, § 18, 89 Stat. 871, 955 (1975) (codified at 15 U.S.C. § 760g (1976)); *accord,* S.Rep. No. 516, 94th Cong., 1st Sess. 208, *reprinted in* 1975 U.S. Code Cong. & Ad.News 1762, 1956, 2050 (Conference Report) ("Expiration would not affect pending civil or criminal proceedings nor would it preclude any legal action based upon any act committed prior to expiration."). The defendants argue that this provision, plain as it is, does not apply because oil controls did not statutorily expire on September 30, 1981; rather, President Reagan exercised the discretionary authority delegated to him by the EPAA to end controls on January 28. *See* Exec.Order No. 12,287, *supra.* The defendants essentially argue that section 18 does not apply because President Reagan affirmatively repudiated oil controls eight months before they would have expired anyway.

■ We believe that this is "a distinction without a difference." *Hamm, supra,* 379 U.S. at 314, 85 S.Ct. at 390. The Presi-

dent's power to end controls early simply has no bearing on whether Congress intended prosecutions for control violations to proceed unabated. Congress could not possibly have intended for prosecutions to continue if the EPAA expired naturally on September 30, but for all prosecutions to stop if, say, the President decided to exercise his discretionary authority to lift controls on September 29. The timing of decontrol has nothing to do with Congress's intent to impose "administrative, civil, or criminal" liability for infractions committed when controls were still in effect.

A report filed by the House Committee on Government Operations in June of 1981 reinforces this conclusion. The committee succinctly summarized its findings as follows:

Whatever the eventual historical judgment of decontrol, ... it is important to remember that the established law of the land over the last decade has included petroleum price controls.

Violations of those controls, whenever they occurred, should be prosecuted in a timely fashion as any other infraction of the law should be. Prosecutorial resources ought to be adequate to enforce the law in a manner consistent with maintaining respect for the law.

H.R.Rep. No. 145, 97th Cong., 1st Sess. 1–2 (1981). The defendants argue that this report was concerned solely with restitution and the imposition of civil penalties. We cannot agree. According to the hearing testimony of the head of the Economic Regulatory Administration, "compliance problems" were indeed "primarily of a civil nature," but civil suits were only part of what the Department was concerned with: "In

---

3. Because the EPAA has an express savings provision, we need not rely upon the general provision set out at the beginning of the United States Code:

The repeal of any statute ... [or] [t]he expiration of a temporary statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the ... [repealing act or temporary statute] shall so expressly provide, and such [repealed or expired] statute shall be treated as still remaining in force for the purpose of sustaining any proper action or

prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109 (1976). Although the predecessor of this section had originally been enacted to reverse the common law presumption of abatement as it had most recently been applied in *United States v. Tynen,* 78 U.S. (11 Wall.) 88, 95, 20 L.Ed. 153 (1871), even the very general language employed in this provision provides evidence of a strong congressional antipathy towards what might be called (for want of a better term) amnesty by expiration or inadvertent repeal.

those instances of suspected criminal activity referrals have been and will continue to be referred to the Department of Justice." *Impact of Administration's Actions on DOE's Office of Special Counsel: Hearings Before ... the [House] Comm. on Government Operations,* 97th Cong., 1st Sess. 51 (1981) (statement of Barton R. House), *reprinted in DOE Enforcement: RIF's and Budget Reductions: Hearings Before the Subcomm. on Oversight and Investigations of the [House] Comm. on Energy and Commerce,* 97th Cong., 1st Sess. 58 (1981). Section 18 of the EPAA establishes Congress's concern with maintaining "respect for the law" even after decontrol, and the "law" in this instance is plainly criminal as well as civil.

B

Despite the fact that the Justice Department—part of the Executive branch—is vigorously prosecuting this case, and despite the fact that the Special Investigations Division of the Department of Energy—also part of the Executive—is assisting

in that prosecution with equal vigor, the defendants claim that the Executive does *not* intend to prosecute this case, and intends, in fact, that this and all similar criminal prosecutions abate immediately. This claim is wholly without foundation.

The gist of the defendants' argument is that Executive Order 12,287 did more than just phase out of existence a regulatory scheme that had outlived its usefulness. It repudiated that scheme totally and retroactively: President Reagan explained that he had signed the decontrol order because "price controls have held U.S. oil production below its potential, artificially boosted energy consumption, aggravated our balance of payments problems, ... stifled technological breakthroughs ... [and] made us more energy-dependent on the OPEC nations." Statement on Signing Executive Order 12,287, 17 Weekly Comp.Pres.Doc. 53 (Jan. 28, 1981). The defendants conclude from all of this that the cases holding abatement inapplicable even after the relevant regulations have expired or have been repealed are simply off point.[4] In *United States v. Res-*

---

**4.** The defendants argue that none of the following cases is applicable here: *Bradley v. United States,* 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973) (express savings clause in new drug control law protected sentence imposed under harsher predecessor statute); *Pipefitters, supra,* 407 U.S. at 432–35, 92 S.Ct. at 2272–74 (prosecution for illegal campaign contributions under Federal Election Campaign Act not abated even after subsequent change in law making conduct in issue legal); *Allen v. Grand Central Aircraft Co.,* 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1954) (liability for exceeding administratively imposed wage ceilings under the Defense Production Act of 1950 persisted even after the expiration of those ceilings); *United States v. Hark,* 320 U.S. 531, 536, 64 S.Ct. 359, 361, 88 L.Ed. 290 (1944) (seller of beef in violation of wartime maximum price regulation still liable even after repeal and replacement of regulation in issue because unrepealed enabling act expressed a "continuing policy" favoring price restraints); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (criminal liability of seller of arms to Bolivia persisted even after revocation of congressionally authorized presidential proclamation prohibiting such sales); *United States v. Thriftyman, Inc.,* 704 F.2d 1240 (Em.App.1983) (DOE subpoena authority under EPAA for investigation of civil violations did not end with the promulgation of Exec.Order 12,287); *Union Oil Co. v. United States,* 688 F.2d 797 (Em.App.1982) (similar case also involving Exec.Order 12,287 and civil liability); *United States v. LaJet, Inc.,* 685 F.2d 1378 (Em. App.1982) (same); *United States v. Resnick,* 455 F.2d 1127, 1133–34 (5th Cir.1972) (discussed in text, *infra* ), *cert. denied,* 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973); *Rodgers v. United States,* 158 F.2d 835 (6th Cir.) (liability for selling cotton in excess of quota established in regulations promulgated pursuant to authority in Agricultural Adjustment Act persisted even after suspension of quotas), *vacated on other grounds,* 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947); *Crary v. Porter,* 157 F.2d 410, 415 (8th Cir.1946) (liability for violation of price ceilings on lumber persisted even after ceilings were subsequently raised to level that would have made sales legal). Because we find that there has been no retroactive repudiation of the oil price regulations in issue in the present case, and because we have been unable to discover any congressional or executive intent to abate criminal prosecutions for violations of those regulations, we think that all of these cases *are* applicable here.

Conversely, and also because of our analysis of congressional and executive intent, we find that the following cases are not applicable: *Thorpe v. Housing Auth.,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) (subsequently mandated eviction procedures must be applied to

*nick,* 455 F.2d 1127, 1133–34 (5th Cir.1972), *cert. denied,* 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973), for instance, a regulation prohibiting the melting of silver coins had been revoked, but no one seriously argued that the regulation had not been useful and necessary while it was in effect. Criminal liability was therefore appropriate. The defendants assert that that is manifestly not the case here. In all fairness, however, they do not argue that they will not have to pay *civil* penalties and disgorge their illgotten profits if they are found liable. *See* EPAA § 5(a)(1), 15 U.S.C. § 754(a)(1) (1976) (incorporating by reference Economic Stabilization Act § 209, 12 U.S.C. § 1904 note (1976)) (restitution); EPAA § 5(a)(3), 15 U.S.C. § 754(a)(3) (civil penalties). They argue only that Executive Order 12,287 and the accompanying presidential statement establish the intent of the Executive to have all *criminal* prosecutions for control-period violations abate.

■ We find that the Executive intends no such thing. The following sworn statement from Secretary of Energy James Edwards—cited by the government and not refuted by the defendants—is in our view dispositive:

There will be no amnesty for violations that were committed by firms during the period controls were in effect.

. . . .

*The Special Investigations Division plans to continue to refer appropriate cases to the Department of Justice for criminal investigation.*

. . . .

We will bring all cases to justice. There will be no amnesty for oil compa-

nies. I do not know how many more times I can say it . . . .

*Energy & Commerce Hearings, supra,* 492–93, 503 (statement of Secretary Edwards) (emphasis added). Secretary Edwards was specifically questioned about his reference to the Special Investigations Division's criminal referral program:

Mr. Synar: On page 2 of your testimony this morning . . . you say: "The Special Investigations Division plans to continue to refer appropriate cases to the Department of Justice for criminal investigation." Have your people at DOE been in contact with the Department of Justice to see how many auditors they have within the Department of Justice that are familiar with the oil industry and DOE regulations?

Secretary Edwards: Mr. Chairman, I would like my [colleague] to respond to that, if he could.

. . . .

Mr. Harvey [Assistant Administrator for Enforcement]: [W]ith regard to special investigations, we are in contact with the Department of Justice on a daily basis concerning special investigations. The Department [of Energy] does the initial audit and investigative work. We refer willful cases to Justice, and they actually take the cases to grand juries and we then act in a supporting role.

. . . .

To allay your fears, we have no intentions of walking away from any special investigation.

*Id.* at 512 (colloquy among Rep. Synar, Secretary Edwards, and the Assistant Adminis-

---

one not yet actually evicted from federally subsidized housing project); *Hamm, supra,* 379 U.S. at 306, 85 S.Ct. at 384 (manifest congressional intent in Title II of the Civil Rights Act of 1964 to substitute federal right to be served at public lunch counter for state-law crime of trespass); *Bell v. Maryland,* 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) (same, under possible construction of state right-to-be-served law); *United States v. Chambers,* 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763 (1934) (repeal of prohibition amendment deprived government of constitutional authority to prosecute and sentence rum-runners); *The Schooner Peggy,*

*supra,* 5 U.S. (1 Cranch) at 110 (prize vessel not yet definitively condemned must be returned to owner pursuant to express provision in duly ratified treaty with France); *Brown v. United States,* 553 F.2d 531 (7th Cir.1977) (city employees who engaged in electioneering prohibited by prior version of Hatch Act possibly not liable because new Hatch Act provision may have substituted first-amendment-like right of political expression for earlier crime); *United States v. Barnett,* 346 F.2d 99 (5th Cir. 1965) (court had itself ordered institution of criminal contempt proceedings and so was also proper authority to order them terminated).

trator for Enforcement, Gordon Harvey). The Executive manifestly does not intend to "walk[ ] away from" criminal prosecutions.

The Department of Energy's criminal investigations and Department of Justice referral activity has, in fact, been quite extensive. According to Administrator Harvey,

[t]he Special Investigations Division of the Office of General Counsel has continued to pursue possible willful violations of DOE price and allocation regulations. Since October 1977, the Special Investigations Division had referred 80 cases to the Department of Justice for criminal investigation involving approximately 150 firms.

The Department of Justice is currently conducting approximately 32 DOE-related, pregrand jury and grand jury investigations in approximately 15 cities throughout the country. To date, 11 firms and 39 individuals have been convicted, pled guilty or nolo contendere on various DOE-related felony and misdemeanor counts. These defendants have been assessed approximately $800,000 in criminal fines and have paid approximately $6,575,000 in civil penalties. Also, 12 individuals have received prison sentences ranging from 30 days to 5 years, and an additional 9 individuals have received suspended prison terms and/or various terms of probation.

*Id.* at 5–6. The head of the Special Investigations Division, Jerome Wiener, further testified about the nature of his division's criminal enforcement efforts:

[W]e have referred to the Department of Justice on the criminal side for criminal investigation many cases involving situations where a reseller has, we allege, taken crude oil of, let's say, a lower regulatory tier and converted it to a higher regulatory tier and then sold it and made a certain amount of money by what we refer to as a flip or a conversion.

Many of those matters have been sent to the Department of Justice and are right now with the Department for continued criminal investigation.

. . . .

The cases we have investigated and referred over are matters where we have found a reseller who has changed, we believe has changed, a regulatory tier.

As to those matters we have referred to the Department of Justice, approximately 26 cases involve that type of activity. We have convictions or indictments pending to date—40 defendants convicted or are pending trial on criminal charges relating to crude reselling activities.

*Id.* at 20 (testimony of Jerome Wiener). The present litigation is not an aberration. It is part of the Executive's continuing program of criminal prosecution for acts committed while controls were still in effect.

When he presented the government's case to us at oral argument, Mr. Wiener further assured us that his department fully intends to do what it actually is doing, namely, prosecuting these defendants:

[E]ven though, we submit, the intent of the legislature in all law of abatement is the important and crucial intent, we will briefly pause and refer to the executive intent only to point out to this court who is here at counsel table. The presence of the government lawyers here, who are part of the Executive branch, clearly indicates the intent of the Executive as far as going further with the prosecutions of these particular cases.

In sum, we do not think that the Executive's intention with respect to the *criminal* prosecution of oil price control violators is seriously open to question.

## IV

■ We conclude that neither Congress nor the Executive intends these prosecutions to abate. The defendants' present case is tantamount to a plea for prosecutorial mercy. This is not the proper forum for that argument. The judgment of the district court dismissing the indictment on grounds of abatement is therefore VACATED and the case is REMANDED with instructions to reinstate the indictment.